Andrew F. Pierce, Esq. (State Bar No. 101889)
Stacy Y. North, Esq. (State Bar No. 219034)
PIERCE & SHEARER LLP
2200 Geng Road, Suite 230
Palo Alto, CA 94303
Phone (650) 843-1900
Fax    (650) 843-1999

Attorneys for Plaintiff KAREN GUTTIERI

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KAREN GUTTIERI, an individual,<br><br>Plaintiff<br><br>vs.<br><br>RAY MABUS, Secretary, United States Department of the Navy,<br><br>Defendants. | Case No.<br><br>**COMPLAINT**<br>**JURY TRIAL REQUESTED** |

Plaintiff, KAREN GUTTIERI, hereby alleges as follows:

## JURISDICTION AND VENUE

1. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 because this the subject matter of some of Plaintiff's claim are premised on Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-2(a) as hereinafter more fully appears. Supplemental jurisdiction of Plaintiff's state law claims set forth herein are premised on 28 U.S.C. § 1367.

2. Venue as to all claims for relief asserted by this Complaint is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## PARTIES

3. Plaintiff KAREN GUTTIERI ("Plaintiff") is, and at all times relevant hereto has been, a female resident of the State of California, County of Santa Clara. From July 6, 2009 to

August 30, 2014, Plaintiff was employed as an Assistant Professor assigned to the Global Public Policy Academic Group ("GPPAG"), under the Office of the Provost from 2009 to 2012, and under the Graduate School of Business and Public Policy ("GSBPP") from 2012 to 2014, at the Naval Postgraduate School in Monterey, California (the "Naval Postgraduate School" or "NPS").

4. As of the time of filing this Complaint, Defendant RAY MABUS is the Secretary of the Navy ("Defendant"). Ray Mabus is sued herein solely in his capacity as Secretary of the Navy.

## PROCEDURAL BACKGROUND

5. On March 11, 2013, Plaintiff timely filed a claim with the Equal Employment Opportunity ("EEO") Office and alleged that she was discriminated against on the basis of her sex and subjected to a hostile work environment on the basis of her sex and retaliation between 2010 and 2013 (the "EEO Complaint").

6. On October 31, 2013, Plaintiff amended her EEO Complaint to include the effective termination of her employment as of August 30, 2013.

7. On February 19, 2014, a copy of an investigation report was transmitted to Plaintiff.

8. The Department of Navy ("DON") issued its final decision on Plaintiff's EEO Complaint in accordance with EEOC Regulation 29 C.F.R. §1614.110(b). It was mailed to Plaintiff on April 17, 2015, and Plaintiff received it a few days later.

9. All conditions precedent to filing a suit have been performed or have occurred.

## ALLEGATIONS COMMON TO ALL COUNTS

10. Plaintiff received a PhD from the University of British Columbia in Political Science with comprehensive fields in public policy and international relations.

11. Plaintiff's numerous publications include journal articles, co-edited books, book chapters, case studies, technical manuals and conference papers in the domains of international security, military strategy and doctrine, international law, cognitive psychology, and organizational learning.

2

12. In 2006, Plaintiff was a member of the research faculty of the Cebrowski Institute. The Cebrowski Institute is a hub of innovation for the information revolution in military and security affairs for the US Navy, the US Department of Defense, and the nation.

13. As a research faculty, Plaintiff began developing two successful, reimbursable programs from the civil affairs and psychological operations community: Stability and Security and Development in Complex Operations and Civil Military Operations and the Rule of Law for the Army's Civil Affairs community.

14. In or around January 2009 the Global Public Policy Academic Group ("GPPAG") was established at the Naval Postgraduate School in order to provide a home for the Plaintiff's education program and other initiatives. GPPAG engaged in unequal hiring practices. GPPAG hired a male Professor, Walter Christman, in January 2009 at the rank of Associate Professor. Unlike Plaintiff, Professor Christman had only recently earned his PhD and had neither teaching experience nor a publication record.

15. In contrast to Professor Christman, Plaintiff formally applied to GPPAG in accordance with standard federal hiring processes. Plaintiff was offered a more junior position as an Assistant Professor in the GPPAG despite her larger teaching experience and publication record. In July 2009 she began working for GPPAG in a tenure-track role.

16. Throughout her employment with NPS as an Assistant Professor, Plaintiff received consistent "meritorious" reviews and frequent pay step increases. Plaintiff was the largest provider of reimbursable research and education funding to the GPPAG. Plaintiff directed multidisciplinary and interagency research teams for projects on Anomie and Insurgency (funded by the Office of Naval Research) and on Governance Innovation for Security and Development (funded by Special Operations Command). Plaintiff's reimbursable funding supported many other NPS faculty and staff.

17. Further, Plaintiff attracted numerous prominent speakers to campus. Plaintiff provided considerable support to administrative capacity for GPPAG, including extensive work with the Chair and other colleagues. Plaintiff assisted with contract writing and other administrative challenges.

18. Despite Plaintiff's exemplary performance, Professor Christman was given preferential treatment with full labor coverage and little teaching or reimbursable requirements; his salary, travel and moving expenses were covered by the Naval Postgraduate School funds with minimal teaching, whereas Plaintiff's salary was primarily dependent on her generating reimbursable funding for research or creating and teaching classes.

19. Shortly after her hire, Plaintiff successfully achieved approval for and acted as the program director for the Stability and Security and Development in Complex Operations and Civil Military Operations and the Rule of Law for the Army's Civil Affairs community. As the program director, Plaintiff was responsible to the Army sponsor to ensure the quality of the program and the appropriate use of its resources. The Chair of the GPPAG, Professor Charles J. LaCivita, scheduled instructors, but the scheduling was supposed to be done in a consultative way with Plaintiff.

20. Plaintiff repeatedly reached out to tenured GPPAG male colleagues to become involved in the activities of the Programs, but they refused to develop curricula tailored to the Program needs. In general, Plaintiff only received support from the females, and then the males would get involved after the class was created. Female faculty were expected to tutor male faculty who would replace them; the males would reap the reward without the work. This was not rotating instruction of courses; the females would be effectively unemployed.

21. One such example occurred almost immediately after Plaintiff was hired. In 2008 or 2009, a female professor, Maria Pineda, created a course for Plaintiff's program. When the first course was to be taught in February 2010, Professor Pineda was instructed to allow Professor Christman to sit in her class so that he could appropriate her materials. Professor Christman exacerbated the inequality by directing the students to bring any complaints to him.

22. When Plaintiff spoke out against the discriminatory treatment, she was treated with hostility. For example, in or around January 2011, then GPPAG Associate Chair Professor McNab told support staff: "[Plaintiff] needs to be put in her place." The staff, who works at the direction of Professor McNab, essentially stopped providing support for Plaintiff and her

4

programs. The Army sponsor's liaison reported that the staff was undermining the Plaintiff as program director.

23. In November 2011, Plaintiff asked a male professor, Frank Barrett, to join in program development. Professor Barrett refused, but said that when the funding was secured, he would teach one of the courses.

24. Plaintiff complained to Professor Barrett that women were creating resources but the men reap the benefit. Professor Barrett warned Plaintiff, "you are junior faculty with your fate in the hands of senior faculty, and if you make remarks about gender, you will be the one to pay a price for it," or words to that effect.

25. Shortly thereafter, Professor Barrett called Plaintiff "entitled" in the presence of Professor McNab and the GPPAG Chair, Professor LaCivita. When Plaintiff told Professor Barrett that "entitled" was a gendered term, he reminded her that he had already warned her of the danger of introducing gender into the conversation.

26. Over the next several years, the same pattern was repeated – the females created classes and the classes were given to the males. On two occasions, males replaced the Plaintiff's name with their own on the funding proposals crafted by the Plaintiff, misrepresenting the authorship. The male faculty began systematically removing female faculty, including Plaintiff, from programs in order to reallocate labor funding for themselves.

27. NPS tenure line faculty is paid for nine months and is expected to bring reimbursable funds for the remaining three months. Faculty who did not win their own reimbursable funding benefitted from the Plaintiff's program as a source of labor coverage without working for it. These male professors did not participate in meetings related to the program and were not reliable. They were not collegial and refused to connect with Plaintiff or the other female professors, as would normally occur in academic practice, and as was particularly demanded by a program that was integrated.

28. In September 2012, the GPPAG, and with it Plaintiff's program, was acquired by the Graduate School of Business and Policy ("GSBPP"). At this time, regular GPPAG meetings ceased. Even so, new Professors were added to GPPAG without any apparent process.

29. Prior to the acquisition, Plaintiff received little mentorship from senior faculty, although the faculty handbook requires mentoring by a faculty mentoring committee. After the acquisition, she received none. For example, senior professors did not observe in classrooms. In contrast, the female faculty and male Naval War College colleagues who assisted the program regularly joined one another's classes and coordinated with one another to create cohesion of the material.

30. In or around October 2012, during a meeting with Dean William Gates, his assistant, and Professor McNab, Plaintiff complained about discriminatory treatment, including the unequal pay and status Professor Christman received. Dean Gates vehemently said, "Oh no, you don't want to go there." Given that Plaintiff was on the tenure track under the a new Department and Dean, she was intimidated and concerned.

31. The Army program sponsor provides a liaison in accordance with the Memorandum of Agreement with NPS. A liaison memo to headquarters on December 20, 2012 reported on a lack of professional courtesies and professional practices by staff, other than Plaintiff. The memo reported that "charter faculty" were "being replaced with professors with zero experience in the subjects they were projected to teach." Further, the memo reported that requirements for the methods course taught by Professor McNab to align with the program were ignored. Plaintiff appealed to leadership to address the sponsor's concerns. Following a visit and a direct complaint by the two star general in charge of the program, GSBPP made some changes in the staffing arrangements only.

32. In 2013, Plaintiff began working with a major university press on a book manuscript on the American military's approach to civil affairs. Plaintiff's work has been was featured in the Journal of Science and in numerous Naval Post Graduate School Public Affairs articles. In 2013 a local television program featured plaintiff among "outstanding women of NPS."

33. In early January 2013, Professor McNab assigned a course, which Plaintiff developed, successfully brought outside funds to support and planned to teach, to another male professor.

34. A General Officer of the Civil Affairs community informed Plaintiff that he had reviewed faculty profiles on the NPS website. He complained to the Plaintiff that the new professors did not have the requisite expertise. Plaintiff explained that she did not have the power to appoint professors.

35. On February 6, 2013, the Chair assigned two male professors to be evaluators of Plaintiff's annual progress, both of whom were engaged in controversy over teaching in the programs Plaintiff developed and directed; they had a clear conflict of interest.

36. On or about the same day, February 6, Plaintiff emailed Deborah Baity, the NPS Equal Opportunity Office ("EEO") representative, to complain about gender bias.

37. On or about February 13, Plaintiff emailed her complaint to the NPS Professional Practices Committee regarding a discriminatory process for demotion and tenure, appropriation of work, and undermining quality of teaching in the Security and Development program. The subject of her email was "harassment."

38. On or about February 21, the Interim Chair, Professor McNab, instructed Plaintiff to retroactively decrease her labor charges to free resources to cover male colleagues who had not provided outside resources. The Chair said that his new policy applied only to faculty with reimbursable accounts, which included Plaintiff and another female faculty member.

39. Professor McNab, as Chair, assigned male professors to teach in the program Plaintiff had developed. The male professors' subject matter expertise did not match the programs, and the males replaced more appropriately experienced female faculty.

40. On February 26, 2013 Professor McNab and Dean Gates informed the Plaintiff that the General had phoned NPS President Jan Tighe to complain. Dean Gates told Plaintiff not to discuss faculty appointments with her sponsor.

41. On March 11, 2013, Plaintiff again contacted the EEO Office and alleged that she was discriminated against on the basis of her sex and subjected to a hostile work environment on the basis of her sex and retaliation between 2010 and 2013. Plaintiff complained that the unequal treatment of female faculty at the Naval Postgraduate School created an environment in which senior ranking men abuse their authority to reap the benefits of the work of junior women.

7

Resources are shifted from female to male faculty without regard to merit or process. Men in the group have appropriated Plaintiff's work as their own, including putting their names on proposals Plaintiff crafted. Plaintiff's male colleagues in positions of authority employ language correlated with a restrictive view of women's professional capacity.

42. The next day, March 12, 2013, in retaliation for her complaints of discrimination and harassment, Professor McNab issued a completely unwarranted letter of reprimand to Plaintiff. The purported basis for the reprimand was that Plaintiff did not add male professors to the courses that Plaintiff had created. However, Dean Gates at this meeting particularly expressed anger that the Army General had phoned the NPS President to complain.

43. Plaintiff filed a grievance regarding the letter of reprimand in March 2013, in accordance with policy timelines. The grievance was sent to Professor Douglas Moses, the Vice Provost for Academic Affairs / Interim Provost and Professor and Chair McNab. Plaintiff provided substantial evidence that the letter of reprimand was unwarranted. Female professors, Maria Pineda and Paula Philbin, also provided memos in support of Plaintiff. Both noted that, despite their assignments to teach in the program, male colleagues had not communicated with them. Professor Philbin wrote "I'm expected to 'graciously' hand over all of my material to strangers?" She notes that she "did all the work, took all the risks." Professor Pineda wrote, "The proposed non-teaching faculty has not shown any interest in the past 5 years in participating in the development of the teaching materials of the certificates, even though he was invited numerous times." Professor Philbin also commented that Professor Christman, a male colleague, "is being far more generously paid to work on his own teaching and syllabus than I am."

44. NPS did not issue a response to the reprimand until September 2013, many months beyond the stated timelines. Further, the Plaintiff's appeal of the reprimand alleged retaliation for EEO complaints. Yet, NPS did not investigate the complaints.

45. In February and March 2013, the Professional Practices Committee suggested that Plaintiff depart GPPAG to establish an independent center on campus as a Professor of Practice. The Professional Practices Committee Chair informed that Dean Gates and Chair McNab agreed.

Doing so would have required Plaintiff to leave her tenure track appointment. Professor of Practice is a Senior Lecturer position, an untenured position, and a demotion. It is also a less secure position, because independent centers on campus were rapidly closing.

46. Despite protest by Plaintiff and the Professional Practices Committee, a meeting on March 19, 2013 to review Plaintiff's progress went forward. GPPAG Chair Bob McNab and Professor Looney were scheduled to attend but did not, leaving three faculty to conduct the review. Professor Jon Czarnecki of the Naval War College witnessed the meeting. Professor Czarnecki's memo observed that the meeting was positive, "Literally there were no specific negatives raised."

47. On April 5, Chair McNab and Dean Gates relocated an intern whom Plaintiff had hired to a male colleague in a separate office. Due to a hiring freeze, the position could not be replaced. Two representatives from the sponsor's command, a male and female officer, met with Dean Gates, Chair McNab and Plaintiff on or about 6 June 2013 to discuss the intern reallocation and other concerns. The female officer reported by memo that Professor McNab "was extremely rude and condescending" and "totally ignored [Plaintiff] as if she wasn't in the room." Professor Gates "treated [Plaintiff] as if she were a little girl that was going to be punished when the all the grown-ups were finished with the conversation." The officer concluded, "the only person that was taken seriously at this meeting was MAJ Kelley who happened to be male." At a meeting later that same week, "Prof McNab was there and treated both me and Prof Guttieri again with disdain."

48. On July 3, 2013, Chair McNab, denied Plaintiff any labor charge to the GPPAG for the entire summer quarter, after the quarter had begun. The Chair wrote, "there is not fourth quarter mission funding," which was not a Naval Postgraduate School policy, as Plaintiff had been paid by the GPPAG in previous summer quarters.

49. On July 18, Plaintiff appealed again to the Professional Practices Committee. Several weeks of uncertainty followed, during which time Chair McNab covered teaching responsibilities for a male colleague in the program. Plaintiff spent considerable time and resources locating alternative work on reimbursable funding for herself.

50. As a tenure-track Assistant Professor in the Naval Postgraduate School, Plaintiff's appointment had been routinely renewed from year to year, as is the custom and practice unless there are serious performance issues. Several years before her tenure clock would expire, Plaintiff's profile compared favorably to male faculty at the time they won tenure.

51. On August 30, 2013, Plaintiff received a notice of non-renewal of appointment. The Naval Postgraduate School policy for tenure-track faculty is to provide a one year notice; therefore, the Plaintiff's appointment would not extend beyond August 30, 2014. The non-renewal of her appointment resulted in the termination of her employment with the Naval Postgraduate School effective August 30, 2014. Plaintiff was removed from the tenure-track and the prospect of applying for tenure.

52. In October 2013, Plaintiff amended her EEO Complaint to include the effective termination of her employment.

## FIRST CAUSE OF ACTION
## VIOLATION OF TITLE VII – SEX DISCRIMINATION
## [Title VII, 42 U.S.C. §2000e-2(a)]

53. Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

54. Title VII makes unlawful for an employer to discriminate against an employee with respect to terms, conditions or privileges of employment because of the employee's sex.

55. By its acts and omissions alleged above, Defendant intentionally deprived Plaintiff of equal employment opportunities, and otherwise adversely affected her status as an employee on the basis of Plaintiff's sex in violation of Title VII, 42 U.S.C. §2000e-2(a).

56. As a direct and foreseeable result of Defendant's unlawful discrimination, Plaintiff has suffered, and will continue to suffer, generally physical, mental and psychological damages in the form of extreme and enduring worry, suffering, pain, humiliation, embarrassment, mental anguish and emotional distress, all to her damage in amounts within the jurisdictional limits of this Court, to be proved at trial.

57. As a direct, foreseeable, and proximate result of Defendant's unlawful conduct, Plaintiff has been injured in that she have suffered, and will continue to suffer, a loss of wages

and salary, bonuses, compensation, employment benefits, career path opportunities, and expenses in amounts to be proved at trial.

58. As a result of Defendant's acts of discrimination as alleged herein, Plaintiff is entitled to reasonable attorney's fees and costs of suit as provided for by 42 U.S.C. §2000e-5(k).

## SECOND CAUSE OF ACTION
## VIOLATION OF TITLE VII - RETALIATION
### [Title VII, 42 U.S.C. §2000e-3(a)]

59. Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

60. Title VII makes it unlawful for an employer to retaliate against an employee who reports or otherwise opposes prohibited discrimination, retaliation or harassment.

61. By its acts and omissions alleged above, Defendants retaliated against Plaintiff for, inter alia, opposing Defendants' sex discrimination and harassment, and complaining about Defendants' sexual harassment, sex discrimination and retaliation, in violation of Title VII, 42 U.S.C. §2000e-3(a).

62. As a direct and foreseeable result of Defendant's unlawful retaliation, Plaintiff has suffered, and will continue to suffer, generally physical, mental and psychological damages in the form of extreme and enduring worry, suffering, pain, humiliation, embarrassment, mental anguish and emotional distress, all to her damage in amounts within the jurisdictional limits of this Court, to be proved at trial.

63. As a direct, foreseeable, and proximate result of Defendant's unlawful conduct, Plaintiff has been injured in that she have suffered, and will continue to suffer, a loss of wages and salary, bonuses, compensation, employment benefits, career path opportunities, and expenses in amounts to be proved at trial.

64. As a result of Defendant's acts of retaliation as alleged herein, Plaintiff is entitled to reasonable attorney's fees and costs of suit as provided for by 42 U.S.C. §2000e-5(k).

//

//

## THIRD CAUSE OF ACTION
## VIOLATION OF TITLE VII – HOSTILE WORK ENVIRONMENT HARASSMENT
### [Title VII, 42 U.S.C. §2000e-2(a)]

65. Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

66. Title VII makes it unlawful for an employer to harass an employee because she is a woman.

67. By its acts and omissions alleged above, Defendants harassed Plaintiff because she is a woman and in retaliation for her opposition to Defendants' sex discrimination, harassment and retaliation.

68. The harassing conduct which created the hostile work environment was committed by Plaintiff's supervisors whom Defendant empowered to take tangible employment actions against Plaintiff, and/or Defendant knew about and failed to prevent the harassment.

69. Said harassment was so severe or pervasive as to alter the conditions of Plaintiff's employment and create an abusive or hostile working environment.

70. As a direct and foreseeable result of Defendant's unlawful harassment, Plaintiff has suffered, and will continue to suffer, generally physical, mental and psychological damages in the form of extreme and enduring worry, suffering, pain, humiliation, embarrassment, mental anguish and emotional distress, all to her damage in amounts within the jurisdictional limits of this Court, to be proved at trial.

71. As a direct, foreseeable, and proximate result of Defendant's unlawful conduct, Plaintiff has been injured in that she have suffered, and will continue to suffer, a loss of wages and salary, bonuses, compensation, employment benefits, career path opportunities, and expenses in amounts to be proved at trial.

72. As a result of Defendant's acts of harassment as alleged herein, Plaintiff is entitled to reasonable attorney's fees and costs of suit as provided for by 42 U.S.C. §2000e-5(k).

//
//
//

## FOURTH CAUSE OF ACTION
## VIOLATION OF THE EQUAL PAY ACT
### [29 U.S.C. § 206(d), *et seq.*]

73. Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

74. The federal Equal Pay Act prohibits employers from maintaining wage differentials based upon sex, 29 U.S.C. § 206(d).

75. By its acts and omissions alleged above, Defendants paid Plaintiff her female colleagues lower wage rates than Defendants paid to Plaintiff's male colleagues for work that requires equal skill, effort and responsibility, and which is performed under similar work conditions.

76. As a direct, foreseeable, and proximate result of Defendant's unlawful conduct, Plaintiff has been injured in that she has suffered a loss of wages and salary, compensation, employment benefits, career path opportunities, and expenses in amounts to be proved at trial.

77. As a result of Defendant's violation of the federal Equal Pay Act, as alleged herein, Plaintiff is entitled to reasonable attorney's fees and costs of suit as provided for by 29 U.S.C. § 216(b).

WHEREFORE, Plaintiff prays for judgment as set forth below:

1) For compensatory (special) damages, including without limitation, lost/unpaid wages (including back-pay and front pay and employment benefits) according to proof;

2) For damages under the Equal Pay Act, 29 U.S.C. § 206(d), in such amount as the Court shall find Plaintiff has been unlawfully underpaid;

3) For liquidated damages in an amount equal to Plaintiff's actual damages for violation of the Equal Pay Act, 29 U.S.C. § 206(d);

2) For general damages, including without limitation, for mental and emotional distress according to proof;

3) For reasonable attorneys' fees pursuant to, without limitation, those provided by Title VII, 42 U.S.C. §2000e-5(k) and 29 U.S.C. § 216(b).

4) For an award of interest, including prejudgment interest, at the legal rate;

5) For costs of suit incurred;

6) For such other and further relief as the Court deems proper.

## JURY DEMAND

Plaintiff Karen Guttieri hereby demands a trial by jury of all issues so trial pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Respectfully Submitted,

Date: July 20, 2015

PIERCE & SHEARER LLP

By: _____
Stacy Y. North
Attorney for KAREN GUTTIERI